1  John Demarest, SBN 132638
Hanger, Steinberg, Shapiro, & Ash
2  a Law Corporation
21031 Ventura Blvd., Suite 800
3  Woodland Hills CA 91364
(818) 226-1222
4  jad@hssalaw.com
Attorneys for Alda Shelton
5  The Law Office of Alda Shelton
Alda Shelton, Bar No. 108586
6  11736 Woodbine Street
Los Angeles CA 90066-2023
7  Phone:    (310) 309-7714
aldashelton@yahoo.com
8  Attorney for Alda Shelton and Michael Wallace

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                      LOS ANGELES

12  in re:                              )    CASE  NO.2:12-bk-50767BR
                                        )
13  THE WOMAN'S CLUB OF HOLLYWOOD,      )    ADVERSARY ACTION: 2:13-
CALIFORNIA,                             )    ap-01854-BR
14                                      )
                                        )
15         DEBTOR.                      )    POST-TRIAL BRIEF OF ALDA
    _____            )    SHELTON AND MICHAEL
                                        )    WALLACE
16  HEIDE KURTZ, Chapter 11 Trustee,    )
                                        )
17         Plaintiff,                   )
                                        )
18         v.                           )    DATE: MAY 17, 2017
                                        )    TIME: 10 A.M.
19  JENNIFER MORGAN, an individual;     )    COURTROOM 1668
NINA VAN TASSELL, an individual;        )
20  ALDA SHELTON, an individual;        )
MICHAEL WALLACE, an individual;         )
21  IAN DUNCAN, an individual;          )
SHERITA HERRING, an individual;         )
22  777LORRAINE GENOVESE, an individual; )
    BEVERLY STEVENS, an individual;     )
23  MONI WILMES, an individual; MISSY KELLY, an )
individual; LAURA ADAMS, an individual; )
24  CARMEN HILLEBREW, an individual; JULIET )
SORCI, an individual; TERESA DARTEZ, an )
25  individual; AIDA MONTE, an individual; LAURA )
SESTI, an individual; DOES 1-10, INCLUSIVE, )
26                                      )
                                        )
27                                      )

28
                           1
    _____
    CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1 | Defendants.                          )
  | _____      )
2 |                                      )

3 | ## TABLE OF CONTENTS

4

5 | I. THE FAC MAKES THE CONCLUSIVE JUDICIAL                1
6 | ADMISSION THAT THE BOARD APPROVED THE SCAPA
7 | LOAN AND THEREBY ALLEGEDLY BREACHED ITS FIDUCIARY DUTY.
8 | HOWEVER, KURTZ NOW ARGUES THAT SHE HAS REFUTED HER OWN FAC:
9 | THAT HER EVIDENCE SHOWED THAT THE BOARD DID NOT APPROVE
10 | THE SCAPA LOAN.  SHE HAS FAILED TO PROVE HER CASE.
11 | 1. Admissions in the pleadings are binding.                1
12 | 2.  The judicial admissions of ultimate fact in the FAC had no        2
13 | evidentiary support, and Kurtz tries to prove a case not pleaded.
14 | II.  KURTZ OFFERED NO EVIDENCE THAT THE CLUB COULD NOT        11
15 | AFFORD THE SCAPA LOAN UNDER THE TURNAROUND PLAN, WHICH
16 | KURTZ TOTALLY FAILS TO ADDRESS.
17 | 1.  Even if the Club "could not afford the loan," no director is liable   11
18 | for breach of fiduciary under Kurtz's judicial admissions.
19 | 2. No Scapa loan payments were made after June 8, 2012, due to    12
20 | Dennis Rook's canceling $31,800 of Morgan's contracts; sabotage of
21 | rentals by Alan Harris; and the permanent loss of possession of the
22 | Club by Morgan and the Board.
23 | 3.  Kurtz has not proven or does she argue that she has overcome    18
24 | the presumption of the business-judgment rule.
25 | III.  KURTZ HAS OFFERED NO PROOF OF DAMAGES.            21
26 | 1. Kurtz is arguing exhibits ruled inadmissible.            21
27 | 2. The damages sought have no foundation.                23
28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

3.   There is no legal basis to impute liability to any defendant.    25

4. Kurtz's whole damage theory is flawed.    27

IV. KURTZ HAS NOT PROVED THAT THE $100,000 RETAINER TO    28

SHELTON WAS A FRAUDULENT CONVEYANCE.

1.   Kurtz has not proven that a "transfer" occurred.    29

2. Kurtz has failed to prove that the Club did not receive    31

reasonably equivalent value for Shelton's services or that Shelton

acted in bad faith.

V. KURTZ OFFERED NO EXPERT TESTIMONY TO PROVE MALPRACTICE. 33

SHE HAS NOT MET HER BURDEN.

VI. THE 1-YEAR STATUTE OF LIMITATIONS RAN ON ATTORNEY    37

MALPRACTICE BEFORE THIS CHAPTER 11 WAS FILED.

VII. IAN DUNCAN LIED IN HIS DECLARATION STATING THAT HE    38

ATTENDED NO BOARD MEETINGS AFTER MAY 28, 2011.

VIII. HEIDE KURTZ PRESENTED NO EVIDENCE OF HER STANDING TO    40

IX. THERE IS NO EVIDENCE THAT THE BREACH OF FIDUCIARY DUTY    41

AND MALPRACTICE CLAIMS ARE CORE PROCEEDINGS.

CONCLUSION    42

## TABLE OF AUTHORITIES

Adams v. Paul (1995) 11 Cal.4th 583    37

Annod Corp. v. Hamilton & Samuels (2002)  100 Cal.App.4th 1286    32

Bowden v. Wal-Mart Stores, Inc., 124 F.Supp.2d 1228, 1236    22

(M.D.Ala.2000)

Budd v. Nixen (1971) 6 Cal.3d 195, 200    38

B. Veasley v. United States 201 F.Supp.3d 1190, 1212

3

(9th Cir.2016)                                                        23

Charter Township of Clinton Police & Fire Retirement                 18

    System v. Martin (2013)  219 Cal.App.4th 924

Daniels v. DeSimone (1993) 13 Cal.App.4th 600, 607                   33

Eldridge v. Tymshare, Inc. (1986)  186 Cal.App.3d 767               18

Exeter Bancorporation, Inc. v. Kemper Securities Group,             19

    Inc., 58 F.3d 1306, 1312 (8th Cir. 1995)

F.D.I.C. v. Perry 184 F.3d 1040, 1044 (9th Cir.199)                 34

Flatt v. Superior Court (1994) 9 Cal.4th 275                        29

Guzzetta v. State Bar (1987) 43 Cal.3d 962

Hoodo v. Holder 558 F.3d 184, 191 (2d Cir.2009)                      1

in re Barker  839 F.3d 1189, 11195 (9th Cir. 2016)                   1

In re Honeycutt 198 B.R. 314, 314 (Bankr. E.D. Ark. 1996)           22

Lee v. Hanley (2105) 61 Cal.4th 1225                                38

Lipscomb v. Krause (1978) 87 Cal.App.3d 970                         34

Murrey v. United States 73 F.3d 1448, 1455 (7th Cir. 1996)          1

Pacific Northwest Generating Co-Op. v. Bonneville                   18

    Power Admin. 596 F.3d 1065, 1077  (9th Cir. 2010)

Piscitelli v. Friedenberg (2001) 87 Cal.App.4th 953                 23

Ritter & Ritter, Inc. Pension & Profit Plan v. Churchill           19

    Condominium Assn. (2008) 166 Cal.App.4th 103, 124

C.C.P. 340.6(a)6                                                    37

Civil Code 3439                                                     29

Civil Code 3439.03                                                  32

11 U.S. Code §101                                                   33

11 USC 108                                                          37

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

Federal Rules of Civil Procedure Rule 11                                    2

Rules of Professional Conduct 4-100(B)(4)                                  30

2 Hon. Barry Russell, Bankruptcy Evidence Manual                       22, 24

Section 301:18 (2015 - 2016 ed.)

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

## POINTS AND AUTHORITIES

### I. THE FAC MAKES THE CONCLUSIVE JUDICIAL ADMISSION THAT THE BOARD APPROVED THE SCAPA LOAN AND THEREBY ALLEGEDLY BREACHED ITS FIDUCIARY DUTY.  HOWEVER, KURTZ NOW ARGUES THAT SHE HAS REFUTED HER OWN FAC: THAT HER EVIDENCE SHOWED THAT THE BOARD DID NOT APPROVE THE SCAPA LOAN.  SHE HAS FAILED TO PROVE HER CASE.

### 1. Admissions in the pleadings are binding.

In re Barker  839 F.3d 1189, 11195 (9th Cir. 2016) held:

  "The Ninth Circuit has acknowledged the doctrine of judicial admissions.
  [Citation.] 'Judicial admissions are formal admissions in the pleadings which
  have the effect of withdrawing a fact from issue and dispensing wholly with
  the need for proof of the fact.' [Citation.] Judicial admissions are "
  conclusively binding on the party who made them."

Murrey v. United States 73 F.3d 1448, 1455 (7th Cir. 1996) held:

  **"A judicial admission trumps evidence. [Citation.]  This is the
  basis of the principle that a plaintiff can plead himself out of
  court."**

Hoodo v. Holder 558 F.3d 184, 191 (2d Cir.2009) stated:

"Facts admitted by a party 'are judicial admissions that bind th[at] [party]
throughout th[e] litigation.' Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440
F.3d 571, 578 (2d Cir.2006); see also Oscanyan v. Arms Co., 103 U.S. 261,
263, 26 L.Ed. 539 (1881) (**'The power of the court to act in the
disposition of a trial upon facts conceded by counsel is as plain as
its power to act upon the evidence produced.'**); 2 McCormick on Evid.

1

§254 (6th ed. 2006) (**'Judicial admissions are not evidence at all. Rather, they are formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission, unless allowed by the court to be withdrawn, is conclusive in the case ...**'"

Federal Rules of Civil Procedure, Rule 11, states:

"(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: .. **(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery... ."**

Rule 11 also provides for sanctions if the Rule is violated.

## 2.   The judicial admissions of ultimate fact in the FAC had no evidentiary support, and Kurtz tries to prove a case not pleaded.

The initial complaint in this case was filed on August 22, 2013. After a motion to dismiss by Shelton, an FAC was filed on February 24, 2014.  Of the 16 initial defendants, Teresa Dartez and Missy Kelly were dismissed on summary judgment in 2016. Nina Van Tassell settled for $100,000.  Eight other defendants were dismissed for zero money and a waiver of their right to sue for malicious prosecution. Only 5 defendants remained for trial: Morgan, Shelton, Wallace, Herring, and Hillebrew. The discovery cutoff was June 30, 2016, more than 3 years after the complaint was filed. Opposing counsel had plenty of time to seek

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  to amend the FAC if the allegations were false or did not present Kurtz's true

2  theory of the case. Any need to amend would have been obvious after counsel

3  conducted 3 years of discovery, had 7 months after filing the complaint to

4  formulate an FAC, lost two summary judgment motions based on the FAC, and

5  obtained declarations from 8 dismissed defendants.  However, despite years of

6  opportunity, Kurtz made no motion to file a SAC, thus letting her judicial

7  admissions stand. This was her choice in a purportedly big-damage case, and it

8  constituted a representation under Rule 11 that her allegations had evidentiary

9  support.

10    The FAC is the operative pleading. This is the pleading of which defendants had

11  notice and on which they prepared for trial, to defend against a damage claim of

12  $2.785 million. The admissions therein are "conclusively binding" on Kurtz.  Her

13  closing brief must show that Kurtz proved the allegations of the FAC, as

14  delimited by its conclusive admissions--or she must lose the case.  She may not

15  suddenly espouse a newly-invented theory of liability, contrary to judicial

16  admissions--a theory of which defendants have had no notice and which is not

17  before the court.

18    Kurtz's counsel, however, utterly ignores the FAC, and her representations

19  under Rule 11, as if they were irrelevant.  She believes that she can argue any

20  theory or set of facts that come to mind, whether or not defendants ever had

21  notice of it during the 3 years this case has been pending.  She argues a state of

22  facts that is in direct contradiction to the FAC's conclusive judicial admissions

23  that have been withdrawn from issue. Kurtz's Post-trial Brief states that she is

24  entitled to judgment because:

25

26    **"1. The Scapa loan was not approved by the Board."** (Kurtz Post-

27    Trial Brief, page 2, line 18.)

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1     The only damages asserted by Kurtz (allegedly $2.785 million) arise from the

2 Board's approval and obtaining the Scapa loan; nothing else. (See p. 36 of Kurtz's

3 post-trial brief, outlining alleged damages.)   Kurtz's never-before-pleaded theory

4 that the Board did NOT approve the Scapa loan is a pivotal argument in her brief.

5 However, Kurtz's present position is totally contrary to a fact that she has

6 conclusively admitted; a fact that has been withdrawn from contention.   Par. 68

7 of the FAC alleges:

8      "68.  The Trustee is informed, believes, and alleges that in August, 2011,

9     ... **the Board caused the Debtor to incur a $700,000 loan (the**

10     **"Scapa Loan")** from Scapa and Associates ("Scapa") secured by

11     a deed of trust against the Property."

12

13     This is not an allegation that the Board did not approve the loan, or had no

14 quorum to approve the loan, or that the loan was not approved by a majority of

15 disinterested directors and the vote was void, as argued at several places in

16 Kurtz's brief.  On the contrary: Par. 68  is a judicial admission that the Board

17 voted to approve the loan and caused the Club to incur it. Indeed, if the Board did

18 not approve the allegedly wrongful loan, there would have been no basis for Kurtz

19 to sue its alleged 16 directors for breach of fiduciary duty. There would be no

20 basis for her Rule 11 representation that she had evidence to back up her claim.

21 There would have to be some other theory of liability for suing the 16

22 defendants. Not voting in favor of a bad loan is not grounds for suing a director

23 for breaching his fiduciary duty.  Moreover, had the FAC alleged the frivolous

24 theory that the directors did not approve the bad loan and that the failure to

25 approve it was a breach of fiduciary duty, there would have been many motions to

26 dismiss by the sued directors. That allegation states no claim for relief. Kurtz

27 has kept this case alive by merely pleading a viable claim for 3 years while she

28

4

sought to go to trial on a theory that states no claim.

Indeed, Kurtz argues that her judicial admissions and Rule 11 representations are meritless, stating: "There is no credible evidence that the Scapa loan was approved by the Board." (Brief, p. 33.) However, evidence has been dispensed with, since her judicial admission is binding.  Moreover, the first claim for breach of fiduciary duty incorporates the admission in Par. 68  and continues:

> "94. The Trustee **incorporates each and every allegation contained in paragraphs 1 through 93,** inclusive, as though fully set forth  herein.
>
> 95. At all relevant times herein, the Defendants (the Board) owed the Debtor the fiduciary duties of care, loyalty and obedience as members of the Board of Directors.
>
> 96. Defendants [identified as "the Board" in Par. 95]  breached said duties through the conduct described above [listed in Pars. 1-93], **specifically approving the wrongful conduct described above.** These breaches include, but are not limited to, the following: (a) causing e Debtor to incur debts to insiders that were beyond the Debtor's ability to pay; (b) causing the Debtor to grant security interests on the Debtor's Property (including to insiders) in amounts that exceeded the actual underlying obligations and without consideration; (c) causing the Debtor to borrow $700,000 from Scapa at a high interest rate with hard money loan terms at a time when it did not have the ability to repay the obligation in order to repay other obligations that were not due to insiders; (d) causing the misuse of the Scapa Loan Proceeds; **(e) causing the Debtor to incur debts to insiders and Scapa without obtaining the approval of all members as required by the 2005 Bylaws ..."**

The foregoing Par. 96 of the FAC supports and repeats the judicial admission of Par. 68.  Par. 96 conclusively admits that the directors **specifically approved all of the conduct listed in Pars. 1-93,** such as: obtaining the Van Randalhoff and Scapa loans and recording trust deeds against the property to secure them; granting Morgan the $100,000 trust deed; and transferring to

5

Shelton a $100,000 retainer.  Par. 71 alleges that Morgan and Shelton are "insiders." Par. 96(b) of the FAC has made the judicial admission that the Board approved granting the security interests to insiders. Par. 96(a) of the FAC makes the judicial admission that the Board approved debts to insiders.  Par. 71 alleges that insider Morgan obtained a $100,000 trust deed and that Shelton was given a $10,000 retainer.

Kurtz argues that no disinterested Board member voted to approve the Scapa loan, and the vote was void (Brief, top of p. 34.) However, Par. 96 of the FAC alleged that the Board caused Club to "incur debts to insiders without obtaining the approval of all members." Kurtz's judicial admission is that the Board approved the loan; not that the approval was void. The only possible infirmity mentioned was that the members did not approve the loan.  However, Kurtz did not even try to prove at trial that member approval was necessary, a concession that it was not.

Par. 70 of the FAC alleges:

> "70. ... Shelton did not advise the Board against incurring the Scapa Loan. Shelton knew at the time that the Debtor could not afford to repay the Scapa Loan and that the Scapa Loan was being used for the benefit of insiders, not for the benefit of the Debtor, and not for the limited purposes set forth in the June 9, 2011 resolution signed by Shelton. Shelton failed to advise the Debtor or the Board that incurring the Scapa Loan would be a violation of the First TRO, the Second TRO, or the Third TRO."

Par. 76 of the FAC is incorporated into the first claim for breach of fiduciary duty. It alleges:

> **"76.  ... [H]ad Shelton properly advised the Debtor and the Board regarding the Scapa Loan, the Scapa Loan would not have occurred."**

This judicial admission in Par. 76 conclusively negates any breach of fiduciary

6

duty or negligence by any Board member, except possibly Shelton.  This admission is an ultimate fact, not a mere evidentiary fact. It admits for purposes of this suit that the Board did not act negligently.  Rather, the blameless Board was not properly advised by Shelton when it approved the Scapa loan.  This admission absolves and exonerates the rest of the Board, including Michael Wallace, for breach of fiduciary duty.  Shelton was purportedly liable for the Board's approval of the allegedly wrongful Scapa loan that caused all the damages asserted by Kurtz.  The Board was the victim of bad or nonexistent advice by Shelton.

The FAC assumes that Shelton was obligated to give advice to the Board and that the advice should have been not to incur the loan. Par. 101(c) of the FAC alleges that Shelton "[caused or counseled] the Debtor to borrow $700,000 from Scapa." The upshot of the foregoing judicial admissions is this:

If Kurtz has not proven her allegation that Shelton improperly advised the Board, then Shelton is not liable for breach of fiduciary duty either, since Kurtz admits that Shelton did not vote for the Scapa loan (See page 1 of Addendum A to Kurtz's Post Trial Brief.) Pursuant to the FAC, Shelton can be  liable for breach of her fiduciary duty only if Kurtz proved that Shelton gave bad or no advice.

However, even to pass the threshold of proving liability for giving bad advice against Shelton, much less damages, Kurtz must prove certain foundational facts:

1.  That Shelton had a duty to advise the Board on the Scapa loan.  If she had no duty, then failure to give advice creates no liability. However, Kurtz offered no testimony proving Shelton's duty, and her brief cites no evidence showing such legal duty; just lawyer's arguments.

Or:

2.  If Shelton did advise the Board, she advised it to take the Scapa loan, and

7

1  the Board relied on her advice.  Kurtz offered no evidence of this.

2        If No. 2 is true, then Kurtz must also prove:

3        3.  The proper advice would have been to tell the Board not to obtain the

4  loan because the Club could not repay it; that is, to inform the Board that the

5  loan was inadvisable given all the circumstances, despite the turnaround plan (to

6  renovate and refinance), and given any other viable options available to the Club

7  to pay for attorneys' fees, renovations, and settle Morgan's threatened lawsuit.

8        Proof of No. 3, the inadvisability of the loan and inability to repay it, takes

9  expert opinion to prove. It also take expert opinion to prove that every careful

10 lawyer would have come up with the same advice; that there would be no margin

11 for reasonable dispute.  Kurtz presented no credible evidence on those issues at

12 trial.  She has therefore not proven any liability on Shelton's part even if Shelton

13 advised in favor of the loan.

14       Kurtz's only evidence even remotely related to the issue that the Scapa loan

15 was inadvisable was Joan Van Hooten's purported expert opinion. She stated that

16 obtaining the Scapa loan violated "nonprofit standards," which standards she

17 could not even define and were found in no book; only in her head. **So**

18 **unconvincing was this testimony that even Kurtz does not even refer**

19 **to Van Hooten in her brief.**

20       Van Hooten was an alleged expert in nonprofit companies. She had no

21 mathematical or accounting degree qualifying her to give an opinion on the ability

22 of Club to repay the loan; or the advisability of obtaining a loan under the

23 turnaround plan; or the advisability of doing something else that would have saved

24 the Club; or of doing nothing at all, which Kurtz implicitly argues was the proper

25 course.  Van Hooten could list no written legal guidelines, statutes, or case law to

26 support her gossamer-thin opinion.  It was also out of line with the law and thus

27 irrelevant.  Kurtz's burden to prove her case was to produce a relevant expert

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  opinion that the loan violated the presumption of the business-judgment rule, not

2  some undefined, nebulous "non-profit" standard.   Van Hooten did not even

3  address the business-judgment rule, if she even knew what it was.   Further, Van

4  Hooten presented no alternative to obtaining the Scapa loan to fund the Club's

5  desperate needs in August, 2011.   She did not say what her "nonprofit

6  standards" would have dictated that the Club do to alleviate its money problems.

7          There was thus no viable expert evidence at all on 2 key issues in Kurtz's

8  case:

9          (1) any alleged gross unsoundness or lack of rational business purpose for

10 the Scapa loan that would be sufficient to overcome the legal presumption that

11 the Board exercised proper business judgment.

12  (2) the indisputable *a priori* inability of the Club in August, 2011, to repay the

13 loan under the turnaround plan--a plan that had an $84,000 set-aside for

14 one-year's mortgage payments and which contemplated a quick refinance at lower

15 interest  after  renovations.

16          These two factors were ignored by Kurtz at trial and now in her brief.   She

17 believes that in order to win her case, she does not have to prove Shelton's duty

18 to give advice or to prove the foregoing 2 key issues. This is because Kurtz has

19 totally abandoned the theory pleaded in the FAC--that the blameless Board was

20 victimized by Shelton's bad or nonexistent advice.   That is not her theory now.

21 The brief argues that the loans, trust deed, and retainer were not approved by

22 the Board. Shelton's bad advice, the keystone of her judicial admission, has

23 become  irrelevant.

24          Since Kurtz argues that nonapproval by the Board is all that she has shown,

25 she herself has disproved her case, just as surely as if defendants had defeated

26 the allegations of the FAC.   Her binding judicial admissions that the Board

27 approved these matters trump her contrary evidence, which must be

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

disregarded.

Indeed, at trial Kurtz did not present witnesses in order to prove the FAC. Instead, she tried to disprove her own allegations, and she argues at length that she has succeeded. Kurtz offered the declarations and testimony of dismissed directors Lorraine Genovese and Ian Duncan, prepared on the letterhead Kurtz's counsel. In exchange for being dismissed, the defendants declared that they did not vote for any loans, trust deeds, or the retainer.  They did not state that they voted to approve the foregoing matters due to Shelton's failure to advise them properly. However, that is the testimony that Kurtz needed from them but did not get. Sherita Herring declared that she did not vote for anything at issue. However, as Shelton testified, none of these people contended that he had not voted for the loan until after he was sued by Kurtz. Shelton testified that in a Board meeting held after the loan closed:

> "A Everybody was, all seven board members.
> Q Were they all physically present?
> A Yes.
> Q Did any of them voice any objection to the loan having
> been obtained?
> A No. Nobody made any complaints.
> THE COURT: Okay. What was the first time, if
> ever, that you had any complaint about the loan?
> THE WITNESS: After we got sued.
> THE COURT: I mean, really. Was that --
> THE WITNESS: 2013, 2014. I don't know.
> THE COURT: But not before this case was filed?
> THE WITNESS: No, no, no." (transcript, March 9, p. 213, lines 5-18.)

All of the "denial" testimony given at trial by directors who want to avoid this lawsuit has been made irrelevant to Kurtz's burden due to her judicial admissions. Kurtz must prove her allegation of Par. 76 of the FAC that the Board approved

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

the loans due to Shelton's bad or nonexistent advice.  Wallace, Shelton, and Morgan may rely--and do rely on--the admission in the FAC that the loans, trust deeds, and retainer were approved by the Board.

Further, Kurtz offered no testimony that Shelton advised the Board to obtain the loans. In her testimony and trial declaration, Shelton denied advising the Board, and Morgan testified that Shelton was not corporate counsel.  Shelton's invoices, Exhibit D61, do not show any bills for advising the Board.  Her retainer agreement, D21, does not include an agreement to give legal services to advise the Board.  Shelton had a retainer for litigation services only.

Kurtz has failed to prove her allegation that the loans, trust deeds, or retainer were approved because Shelton advised the Board improperly. She did not prove that the Board relied on Shelton's advice; that Shelton had any duty to advise the Board at all; or that she advised the Board.  Shelton thus has no liability for breach of fiduciary duty, nor does any Board member.

## II.  KURTZ OFFERED NO EVIDENCE THAT THE CLUB COULD NOT AFFORD THE SCAPA LOAN UNDER THE TURNAROUND PLAN, WHICH KURTZ TOTALLY FAILS TO ADDRESS.

Kurtz also contends that judgment against all defendants in her favor is supported by the sole purported fact that:

**"2. The Club could not afford the Scapa loan."** (Brief, page 2, line 18.)

There are 3 problems with this statement, as urged below:

## 1.   Even if the Club "could not afford the loan," no director is liable for breach of fiduciary under Kurtz's judicial admissions.

Kurtz has made the judicial admission that the Board voted for the Scapa

11

1  loan only because Shelton failed to inform it that the Club "could not afford the
2  loan," whatever that means. Thus, no director is liable for breach of fiduciary
3  duty, except possibly Shelton, since every director was misinformed or misled
4  and thus was not negligent.

5      As to Shelton, as argued in Section I, Kurtz presented no evidence that
6  Shelton had a duty to advise the Board about the loan; or that she advised the
7  Board to vote for the loan; or that the loan was an unsound or irrational business
8  decision; or that it "could not be afforded." Thus, Shelton is not liable for giving
9  bad advice or failing to give advice.

10      Last, since Kurtz admits that Shelton and Wallace did not vote for the loan,
11  Shelton and Wallace are not liable for breach of fiduciary duty.  They did not vote
12  for it, even if it could not be afforded.

13      The alleged unaffordability of the Scapa loan does not give rise to any liability
14  for anyone.

15  **2. No Scapa loan payments were made after June 8, 2012, due to**
16  **Dennis Rook's canceling $31,800 of Morgan's contracts; sabotage of**
17  **rentals by Alan Harris; and the permanent loss of possession of the**
18  **Club by Morgan and the Board.**

19

20      Receiver Dennis Rook, the ally of Club's adversary Alan Harris, took over the
21  Club on June 8, 2012. (See Shelton trial dec., Par. 87; Morgan trial dec., Par.
22  103.) Kurtz's own witness, Edna Jones, testified that Morgan had $31,000 in
23  rental contracts when Rook took over (Feb. 15, 2017, transcript, page 218, lines
24  9-17.) Morgan stated the same (Morgan trial dec., Par. 102; trial transcript,
25  March 8, 2017, at p. 91) Shelton testified without objection that Rook canceled
26  those contracts (March 9, 2017, transcript, p. 74, lines 7-8). Morgan testified
27  without objection the same way (transcript, March 8, 2017, at p. 91.). Morgan

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  stated that Rook locked out Morgan and the Board (Morgan dec., Par. 103.)

2  Shelton stated that after Rook took over:

3

4  "89. The Board had no further control over the bank account, renting out

5  space, advertising, complying with existing contracts, getting new

   customers, or paying bills after June 8, 2012.  Our turnaround plan was

6  totally squashed." (Shelton dec., Par. 89.)

7

8  Shelton discussed the Club's turnaround plan in her trial declaration (Pars.

9  56-58,) The Scapa loan was to be a bridge loan until renovations were done using

10 the loan proceeds and a lower interest rate loan could then be found.  One year of

11 mortgage payments was to be made from an $84,000 set-aside from the loan

12 proceeds; not from income. Payments were $7,000 a month. Shelton agreed to

13 cap her fees at $100,000 for all lawsuits if she were given a $100,000 retainer.

14 Kurtz introduced no evidence that the turnaround plan was not working at the

15 time that Rook took over. She introduced no expert testimony that the loan and

16 the plan were not done for a rational business purpose.  Indeed, the evidence

17 shows that the Club could have paid off the one delinquent May, 2012, mortgage

18 payment out of the incoming June contract income, but for Dennis Rook's

19 canceling of all contracts. Rook was discharged for bias by Judge Ramona See on

20 July 17, 2012 (Shelton dec., Par. 87, Exhibit D91.) This court can infer that Rook

21 canceled the contracts at the request of his 40-year-long friend, Alan Harris

22 (See Rook's admissions of bias in Exhibit D70, the July 10, 2012, transcript of

23 the mini-trial against Dennis Rook in front of Judge Ramona See.)

24 The court can conclude that canceling the contracts, smashing Club's income,

25 and causing Club's downfall was the scheme of Alan Harris, who got his friend

26 Rook appointed receiver without telling the court of Rook's bias, and who told

27 Rook what to do.  No rational receiver would cancel $31,800 in contracts when a

28

13

loan was in default which could easily be cured with that income.  Rook's actions were a continuance of Alan Harris's plan. Harris had been sabotaging income all throughout Morgan's tenure.   Morgan testified that:

> "[Sara] Van Horn, [Rosemary] Lord, [Alan Harris], and [David] Garrett patrolled the property and frightened prospective renters off continuously." (Morgan dec., Par. 95.)

These Club adversaries were in league to crush the Club and take it over themselves. Morgan declared that Sara Van Horn would call Alan Harris to come to the Club when Van Horn saw Morgan talking to prospective renters. Then:

> "98. ... Immediately after Harris arrived, he would approach Club's prospective renters and tell them in my presence that a receiver had been appointed and that only the receiver had authority to rent the place. He told them that I was illegally holding the Club hostage. ... [Often Van Horn would approach Morgan and a prospective renter] and tell the person I was with that I was not allowed to rent the property and that a receiver had been appointed. Then Van Horn would run back to probate court and tell Judge Goetz I had violated the restraining order [restraining Morgan from getting too close to Van Horn.] **One day Harris chased Elizabeth and me down the driveway screaming. Elizabeth called 911. I locked the front door. The police came and tried to remove Harris peaceably, but he would not leave until they threatened to arrest him.**
>
> 99. ... The Club lost about 50% of Club's prospective renters, which obliterated the business and severely damages the Club's revenue stream." (Morgan trial dec., Pars. 98 and 99.)"

Kurtz offered no testimony to refute Morgan's damning account of what Alan Harris, Sara Van Horn, and Rosemary Lord were doing. Harris was a violent madman, bent on destroying Club's income so that he could take the property for himself.  Kurtz does not address those horrific facts in her brief because they do not help her theory that the Club "could not afford" the Scapa loan.  Morgan was

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1 facing the sabotage of 50% of Club's income by crazy Alan Harris, yet Kurtz
2 blames Morgan and the Board, not Alan Harris and Dennis Rook. She blames the
3 victim, not the perpetrators and their ringleader. In fact, Kurtz's counsel is allied
4 with the perpetrators, and she used Rosemary Lord as a friendly witness.

5 Kurtz also totally ignores Dennis Rook's canceling the $31,800 in contracts
6 for Club events in June, 2012, and the effect of that on defendants' ability to
7 make the mortgage payments. Kurtz failed to introduce any evidence: (1) that
8 one dime was made after Rook took over--and if not, why not; (2) that Rook made
9 any payments to Scapa; or (3) that Rook tried to refinance the loan, since
10 renovations had been completed. Kurtz did not sue Alan Harris for intentional
11 interference with contract or Dennis Rook for breach of fiduciary duty. Instead,
12 she sued the Board and now contends that the Club could not afford the Scapa
13 loan, arguing, without any proof, that Morgan, Shelton, and Van Tassell
14 "destroyed the Club" (Brief, page 2.) She has nothing negative to say, or any
15 comment at all, about Alan Harris and Dennis Rook. According to Kurtz, their
16 egregious actions contributed not in the slightest to Club's need to file
17 bankruptcy. This whitewash and pointing the finger in the wrong direction is mind
18 boggling. It casts doubt on Kurtz's entire case.

19 Morgan testified, without objection and without contradiction (transcript,
20 March 8, 2017, at p. 91);

22 "Q.  Did it appear to you that the club was being successful on that?
A Yes.

23 Q And did that success -- I mean, was February just one good year -- or
24 one good month, or did you --

25 A No. It continued. We had a little bit of a downtime in April, if I remember
26 right, because we had closed it to do a ceiling or something. I can't remember.
27 But that was also the month that we had a huge celebration and an opening of
the club after it was renovated. Margaret Ryan (phonetic) cut the ribbon for

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

the club to open in its 117th year. But other than that, **in May [2012] I believe I signed $31,800 in new contracts for the coming month.**

Q Well, I mean, based -- I mean, did you believe that the club was accomplishing what they had wanted done with the SCAPA loan?

A **No question about it.**

Q And then, then do you believe that there -- I'm sorry. **Was there something that affected the club's ability to keep accomplishing what its goal was?**

**A Yes.**

**Q What was that?**

**A Dennis Rook came in.**

**Q And what did he do when he came in?**

**A He shut the club down.**

THE COURT: You're talking about the June 7th when he came in?

**THE WITNESS: Yes. He canceled the contracts and closed the club.**

BY MR. DEMAREST:

Q With the way that the -- with the renovations that had been performed

A Yes.'

Kurtz's own witness, Edna Jones, a Club employee when Rook took over, corroborated that the Club had $31,000 in contracts when Dennis Rook came in and that Jones was "making a lot of money for the Club." This is proof that the turnaround plan was working, and Scapa could be paid. Jones testified:

"Q Okay. When Dennis Rook took over, did you prepare a declaration for me [Alda Shelton] stating that **the club had $31,000 in contracts?**
**A Yes, I did.**
**Q And was that true?**
**A That was true, because I was making a lot of money for the club. Yes.**
Q Do you know if those contracts were ever fulfilled?
A I have no idea." (Feb. 15, 2017, transcript, page 218, lines 9-17.)

16

Shelton testified: (March 9, 2017, p. 245, 3-25):

"A It [income] was down in April [2012] because some more renovation work had been done. Jennifer Morgan and the club wanted to have asbestos removed from the ceiling and [sic: in] the entry way, and it made the club kind of unusable. So that's why that went down in April.

Q Okay. ...

**A And then it was going -- but then by June, she had $31,000 in contracts. So it was down, and then it was going up again."**


Shelton also testified: "Then Rook canceled the contracts and the clubhouse was closed." (March 9, 2017, transcript, page 74, lines 7-8.)  Morgan testified (March 8, 2017, p. 94):

"BY MR. DEMAREST:

Q And I just want to confirm. After these contracts were canceled and the club was closed, did you have any more involvement with the club? Were you ever brought back to try to renegotiate, try and get a new loan?

A No. And the loan I had negotiated, which was from the SBA, it was something that -- it was from the Obama stimulus package was small businesses. And it was from the SBA. It sunset in September of 2013. The interest rate on that gave us a payment of $4,600 a month.

THE COURT: So what happened with that?

THE WITNESS: I don't know, because the Trustee was in by then. **And that loan would have been great because all that loan needed was -- the payment-to-loan ratio was only 35-percent, and we could easily have made it."**


Morgan testified on March 8, 2017, at p. 203:

"A Well, $4,500 they [sic: was] swiped by the receiver. ...

A Dennis Rook, I mean.

Q So $4,500 was swiped by the receiver?

A Or -- yes."


The unrefuted testimony is that the turnaround plan would have succeeded

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

and Scapa would have been paid but for Dennis Rook. However, the fact that no payments were made on the loan from Rook's takeover on June 8, 2012, until December 13, 2012, when this bankruptcy was filed, caused the need for Chapter 11 protection. Kurtz offered no testimony that any defendant caused this Chapter 11.  Although she goes on at length about the two previous bankruptcy filings, which occurred when Morgan was in control, both of those bankruptcies were dismissed because Club was not insolvent and did not qualify for Chapter 11. Only the instant bankruptcy was not dismissed.  This occurred only after Morgan had lost control of the Club and its rentals for 7 months, and Rook and Harris torpedoed Club's income. Kurtz ignores the real culprits and goes after the victims,

**3.  Kurtz has not proven or does she argue that she has overcome the presumption of the business-judgment rule.**

Charter Township of Clinton Police & Fire Retirement System v. Martin (2013) 219 Cal.App.4th 924, 941 stated:

"The pleading does not establish the executive compensation plan was so ill-conceived and irrational as to violate the business judgment rule ... "

Pacific Northwest Generating Co-Op. v. Bonneville Power Admin. 596 F.3d 1065, 1077   (9th Cir. 2010) stated:

"For example, under the common law 'business judgment rule,' courts are required to defer to business decisions made by a corporation's board of directors, unless 'the directors [, among other things,] act in a manner **that cannot be attributed to a rational business purpose.'"**

Eldridge v. Tymshare, Inc. (1986)   186 Cal.App.3d 767, 776 stated:

18

"The business judgment rule is premised on the notion that "those to whom the management of the corporation has been entrusted are primarily responsible for judging whether a particular act or transaction is one which is helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes...."

Ritter & Ritter, Inc. Pension & Profit Plan v. Churchill Condominium Assn. (2008) 166 Cal.App.4th 103, 124 stated:

"The business judgment rule 'sets up a presumption that directors' decisions are based on sound business judgment. This presumption can be rebutted only by a factual showing of fraud, bad faith or gross overreaching.'"

F.D.I.C. v. Perry 184 F.3d 1040, 1044 (9th Cir.199) stated:

"California Corporations Code, Section 309 codifies California's business judgment rule. See Gaillard v. Natomas Co., 256 Cal. Rptr. 702, 705 (Ct.App. 1989). The general purpose of the business judgment rule is to afford directors broad discretion in making corporate decisions **and to allow these decisions to be made without judicial second-guessing in hindsight."**

Thus, the ultimate success or failure of Board action is not relevant.   It is whether circumstances at the time of the decision made the decision attributable to a rational business purpose.

Kurtz offered no expert testimony to overcome the presumption that the Scapa loan was related to a rational business purpose or that it was so ill-conceived and irrational that the presumption of sound Board action should not be deferred to.   Joan Van Hooten's valueless expert testimony was discussed in Section I above. Further, Van Hooten did not even render an opinion that the presumption of valid board action under the business-judgment rule should be

19

1  abrogated. The closing brief itself does not argue that Kurtz has proven that the

2  presumption of sound Board action should be abrogated.  This vacuum of

3  argument and citation of evidence is a concession that the Scapa loan approval is

4  entitled to the presumption.

5      Defendants introduced evidence of the turnaround plan, which was strong

6  evidence of a rational business purpose, entitled to the presumption of the

7  business-judgment rule. This was a plan to pay on the Scapa loan--which was only

8  a bridge loan, not a permanent loan--for up to one year out of an $84,000 set

9  aside from the loan proceeds, at $7,000 a month.  Then the Club would refinance

10  Scapa's loan at a lower interest rate as soon as renovations made the clubhouse

11  a more desirable rental and the Club's increased income was more attractive to

12  ordinary lenders. The loan allowed the Club to obtain Shelton's services capped at

13  $100,000 for all litigation at $150 an hour, while it had been paying $450-$550 an

14  hour to Hennelly and Grossfeld.

15

16      This turnaround plan was also shown in a contemporaneous email from Shelton

17  to Morgan on August 22, 2011, the day the loan closed, Kurtz's Exhibit 123 to

18  Edna Jones' trial declaration. Shelton stated therein:

19

20      "I got $263,000 wired to my Woman's Club trust account today and
       $100,000 to my attorney trust account. **We can start repairs right**
21     **away.**

22      **... Now we just need to try to trade in the high interest rate**
       **for a lower rate."**
23

24

25      This email, sent long before this suit arose, shows that the turnaround plan is

26  not a recent fabrication invented just for this case. One wonders why Kurtz would

27  have her own witness introduce an email so indicative of a rational business plan

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  and of the compliance with sound business judgment in the intent to obtain a

2  lower interest rate loan as soon as possible.   In any case, Kurtz ignores her

3  burden to disprove that this plan--which is reasonable and shows a rational

4  business purpose on its face--was actually irrational when implemented in August

5  22, 2011.   Rather, the turnaround plan is not discussed at all in Kurtz's brief.

6  Kurtz could make no argument discrediting the plan because she presented no

7  expert opinion that the plan was patently unreasonable or that it was not

8  succeeding (until Rook came along.)

9       Moreover, the Club's desperate circumstances  are also mentioned nowhere in

10  Kurtz's brief.   Kurtz assumes that the court will believe that the Club had no need

11  for money for renovations, attorneys' fees, or to settle Morgan's threatened

12  lawsuit and walkout. None of defendants' evidence of Club's financial plight is

13  given one line of argument. Kurtz's failure to address or even acknowledge the

14  Club's various needs for money and the fact that the Scapa loan was an intended

15  solution is a gaping hole in Kurtz's logic. No source of money better than the

16  Scapa loan for Club's problems is set forth in Kurtz's brief or revealed by any

17  expert at trial. Moreover, no evidence that the plan was not working is given.

18

19  **III. KURTZ HAS OFFERED NO PROOF OF DAMAGES.**

20

21  **1. Kurtz is arguing exhibits ruled inadmissible.**

22

23       On page 36 of the Post-Trial Brief, Kurtz lists exhibits supporting damages

24  which her attorneys know were not introduced into evidence because the exhibits

25  were excluded on defendants' motion. Kurtz's attorneys have submitted these

26  damages via the excluded exhibits,  knowing they are violating evidence rulings

27  made by this Court.

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

Beyond the fact that the Scapa loan was $700,000.00, the other items listed were not introduced into evidence.    If the list looks familiar to the Court, that is because it comes from the declaration of Kurtz's expert Don Fife, who as a result of her attorneys' violation of Rule 26(a)(2)(B), was excluded from testifying.    Resubmitting this list in the Post-Trial Brief and citing exhibits that were excluded as evidence is an intentional, willful, and deliberate violation of this Court's ruling.

Statements about damages in a trial brief and in closing argument are not evidence. 2 Hon. Barry Russell, Bankruptcy Evidence Manual Section 101:1 (2015 – 2016 ed.)  "It is a basic tenet of law that statements of counsel in briefs or during trial are not evidence."   In re Honeycutt 198 B.R. 314, 314 (Bankr. E.D. Ark.  1996)

Bowden v. Wal-Mart Stores, Inc. 124 F.Supp.2d 1228, 1236 (M.D.Ala.2000) ("[T]he opinions, allegations, and conclusory statements of counsel do not substitute  for  evidence.").)

See also Exeter Bancorporation, Inc. v. Kemper Securities Group, Inc., 58 F.3d 1306, 1312 (8th Cir. 1995) (statements of counsel not evidence); In re Nielsen, 211 B.R. 19 (B.A.P. 8th Cir. 1997) (neither statements of counsel nor exhibits to briefs are evidence unless expressly stipulated as admissible evidence). This  is also applicable to Plaintiff's Post-Trial Brief Addendum A.  See In re Oakley, 503 B.R. 407 (Bankr. E.D. Pa. 2013) (Documents simply attached to post-trial submissions but never offered in evidence generally cannot be considered by the court, as the opposing party will have had no opportunity to challenge their authenticity or admissibility, cross-examine witnesses regarding those

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  documents, or offer rebuttal evidence).

2

3  Accordingly, it is submitted that the Court should not take into consideration

4  any of "damages" listed.

5

6  **2. The damages sought have no foundation.**

7

8  <u>Piscitelli v. Friedenberg</u> (2001) 87 Cal.App.4th 953, 989 stated:

9  "... it is fundamental that 'damages which are speculative, remote,

10  imaginary, contingent, or merely possible cannot serve as a legal basis for

11  recovery.'"

12  <u>B. Veasley v. United States</u> 201 F.Supp.3d 1190, 1212 (9th Cir.2016)

13  stated: 'The burden of proof is upon the party claiming damages to prove that he

14  has suffered damage and to prove the elements thereof with reasonable

15  certainty.'"

16  Kurtz's brief lists her alleged damages on page 36.   However, Kurtz did not

17  testify that she had actually incurred any costs, for she did not testify at all.

18  She was not available for cross-examination as to these alleged damages, which

19  were not in her almost-totally-stricken declaration, either. Further, no expert

20  testified as to the amount of damages, assuming that an expert would have

21  personal knowledge of them. There was simply no evidence whatsoever of

22  damages. All damages are based solely on the legal argument of Autumn Spaeth.

23  This is not evidence.   Without proof of damages, Kurtz has no case.

24  Moreover, no evidence whatsoever was introduced as to the following costs,

25  and no testimony was given as to why any defendant is liable for them:

26  Scapa Legal fees and costs               $41,556

27  Scapa advances                          $10,337

28

23

| | |
|---|---|
| Scapa late fees | $14,000 |
| Scapa forbearance fee | $75,000 |

Kurtz cites Exhibits 185-188 as proof of these costs.  However, no witness authenticated these exhibits.  Kurtz did not testify that she paid these costs.  Objection is being made to the exhibits.

Kurtz also seeks the trustee fees and attorney fees below:

| | |
|---|---|
| Trustee Fees from Chapter 11 | $108,099 |
| Trustee expenses from Chapter 11 | $1,438 |
| Counsel for Chapter 11 trustee fees | $1,344,212 |
| Counsel for Chapter 11 trustee expenses | $46,206 |
| Post confirmation Chapter 11 Plan trustee | TBD |
| Post confirmation Chapter 11 counsel | TBD |

She seeks these huge fees of over $1.5 million on the basis of inadmissible evidence--fee applications--which she lists in a footnote: Exhibits 189-192.  However, her request for judicial notice of these unapproved fee applications, Exhibits 189-192, was denied on the first day of trial.  Despite the court's clear ruling, she relies on these inadmissible documents again, thumbing her nose at the court, as if it cannot remember its order, or as if it may change its mind.  She puts defendants to the task of arguing the same issue again. This conduct of constantly ignoring the court's orders and local rules  should be sanctioned and reflect negatively on Kurtz's case.

No evidence of the justification for these fees of Kurtz or her counsel or any legal reason why defendants are liable for the fees was presented.

24

Kurtz also seeks:

Expert reports related to                TBD

litigation

This foregoing is a cost only if Kurtz wins the case.

### 3.   There is no legal basis to impute liability to any defendant.

Kurtz's argument as to why defendants are liable for any damages at all is set forth on page 35:

> "Defendants entered into a loan agreement they knew the Club could not afford in order to pay themselves and fund the legal costs to maintain control of the Club and its property.  This proximately caused damage to the Club."

First: Shelton and Wallace did not enter into the Scapa loan agreement.  They did not vote for it, and they did not sign the escrow papers, the note, or the trust deed. Morgan signed the loan documents. They are thus not liable under Kurtz's  theory.

 Moreover, Par. 68 of the FAC conclusively admits that the Board approved the Scapa loan, so Morgan was entitled to obtain the loan and enter into the agreement. Shelton was entitled to the retainer, since the Board approved the loan.

Moreover, Kurtz disregards the fact that Shelton had a signed contract to perform legal services; she was never fired; and she was entitled to be paid. Whether she took the money from the retainer or billed the Club, and it had to take the money from its bank account, the result was the same. The fees were incurred. However, with the retainer, Shelton capped her fees at $100,000, which she would not have done without the retainer.

Shelton and Wallace have no liability under Kurtz's sole theory of liability: that they "entered into" the Scapa loan agreement. They obviously did not.

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

Second, no evidence was introduced to support Kurtz's theory that the Club could not afford the loan. She has introduced no evidence compelling the abrogation of the business-judgment rule. Further, Kurtz has not refuted defendants' evidence that Dennis Rook's sabotage was the cause of Club's inability to pay the Scapa loan.

Kurtz often argues that defendants "caused" the bankruptcy. No evidence was introduced to show this. No evidence was introduced to show why Shelton and Wallace or any director is liable for one cent of the Scapa loan or why the Scapa loan is a "damage." Rather, the loan provided benefits which Kurtz will not acknowledge. The loan paid off property taxes of $13,000, as seen by the loan closing statement. It paid off the $150,000 TD of Van Randalhoff, who had given value to the Club. It paid off a $100,000 demand note signed by Nina Van Tassell and approved by the Board that settled a potentially disastrous and expensive lawsuit with Morgan. It paid a refundable retainer for future services to Shelton, who then capped her fees at $100,000 at $150 an hour. It permitted the Club to renovate the property, at a cost of $193,000, and increase its income. Since all of these items benefitted the Club, there was no damage from the loan.  Kurtz presented no testimony on damages in any event. Her damage theory is supported by nothing except two pages of lawyer's argument from Autumn Spaeth in the closing brief, with no citation of any testimony.

The burden on liability and amount of damages rests with Kurtz.  In this case, Kurtz has no evidence of liability or damages. Yet, even "[w]hen the evidence presented by both parties is evenly balanced, the party with the burden of proof must lose." (citations omitted.) 2 Hon. Barry Russell, Bankruptcy Evidence Manual Section 301:18 (2015 - 2016 ed.)

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  **4.   Kurtz's whole damage theory is flawed.**

2

3    Kurtz contends that the Club could not afford the loan and thus, should not

4  have obtained it.   Kurtz ignores all the negative ramifications to the Club if the

5  loan not been obtained, such that without the loan there was no means to repair

6  the property so that income could come in, etc.

7

8    Kurtz's contention is implicitly argued as if it were a settled theory of

9  economics or a maxim-–that under no circumstances should a company obtain a

10  loan unless it has the ability, at the time of taking out the loan, to pay off the

11  loan from its current income, and not from the loan proceeds. To make such a

12  sweeping generalization, it would be expected that Kurtz would cite some statute

13  or code; or offer the testimony of an accountant or economics Ph.D.--an expert

14  witness who would confirm the validity of such a bold economic pronouncement,

15  valid in every situation on the planet.   However, Kurtz presented nothing. Her

16  theory is based on the completely unsupported argument of counsel--an

17  argument that defies logic and flies in the face of common knowledge that

18  corporations in trouble often seek loans to avoid bankruptcy and then turn

19  themselves around.   In 2009, the automobile industry did not have the capital to

20  keep going, and it was only able to avoid bankruptcy with an $80,000,000,000.00

21  bailout in government loans. The industry did not make the payments out of

22  current operating income, yet it survived and is healthy again. However, Kurtz

23  asserts that Club had no right to borrow money and try to turn itself around

24  unless it could immediately pay its way from current income as it went. There is

25  no evidence of the correctness of this theory except Autumn Spaeth's implicit

26  assumptions.   They must be disregarded, for they are not evidence.

27

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1    Kurtz also contends the current bankruptcy was the result of the actions in

2  2011 in obtaining the loan.  She appears to assume that this is incontrovertible;

3  so much so that she made no effort to present any evidence that the current

4  bankruptcy was the result of the Scapa loan. Neither Kurtz, Dennis Rook, any

5  expert, or even one witness, not even Rosemary Lord, the current president of

6  the Club, took the stand and testified that the actions of Defendants led to the

7  current bankruptcy.  On the contrary, defendants' evidence was that the plan and

8  purpose of the Scapa loan were a success and on track to be completed after one

9  year.  The Club was renovated and being rented again, with $31,800.00 in rental

10  contracts for June, 2012. The Club was in a position where Defendant Morgan

11  would be able to obtain a conventional loan at a lower interest rate so that the

12  new loan would replace the Scapa loan.  All the above was evidence presented at

13  trial, unrefuted by Kurtz. Not one witness, not one document was presented to

14  dispute any of the above.

15    However, what is also undisputed was that when the receiver Dennis Rook

16  took over he canceled the $31,000.00 in rental contracts for June, 2012.

17  Further, Kurtz submitted no evidence that once Rook took possession that he

18  even attempted to earn any rental income, let alone that the Club had any

19  income.  Kurtz submitted no evidence that once Rook took possession he made

20  any attempt to obtain the conventional loan called for in the plan to reduce the

21  loan payments. He let the $7,000 a month keep accruing. No damages have been

22  shown aising from the acts of defendants, who lost control of their plan.

23

24  **IV.  KURTZ HAS NOT PROVED THAT THE $100,000 RETAINER TO**

25  **SHELTON WAS A  FRAUDULENT CONVEYANCE.**

26

27    The 15th., 16th, 17th., and 21st.  claims are for fraudulent transfer against

28

28

1  Shelton as to the $100,000 retainer wired into Shelton's trust account from the

2  August, 2011, Scapa loan proceeds.  These 4 claims do not allege any other

3  transfer to Shelton to be fraudulent.

4  **1.  Kurtz has not proven that a "transfer" occurred.**

5

6  Shelton and the Club signed a retainer agreement on May 1, 2011, in which

7  Shelton received no funds (Shelton Dec. Par. 6; retainer agreement, Ex. D21.)

8  Shelton agreed to became director as of May 28, 2011 (Shelton dec., Par. 9.)

9  Morgan wired Shelton a $100,000 retainer from the August, 2011, Scapa

10  proceeds for future services (Shelton Dec., Par. 61 and 68.) The money had not

11  been earned when it was put into an attorney-client trust account, and Shelton

12  had no present property interest in the funds (Shelton's invoices, D61, showing

13  that all of the $100,000 was debited against work done after August 22, 2011.)

14  There was no "transfer."  Rather, Shelton was a trustee for the Club of the

15  funds until she earned some or all of the money. The funds were reachable by a

16  judgment creditor, for they were Club's property. Civil Code 3439 states:

17  "(a) A transfer is made:

18  ... (2) With respect to an asset that is not real property or that is a
fixture, when the transfer is so far perfected that a creditor on a simple

19  contract cannot acquire a judicial lien otherwise than under this chapter that

20  is superior to the interest of the transferee. ...

21  (c) If applicable law does not permit the transfer to be perfected as
provided in subdivision (a), the transfer is made when it becomes effective

22  between the debtor and the transferee."

23  Funds in an attorney-client trust account are held by the attorney as

24  constructive trustee for the client-beneficiary until they are earned.  Before

25  then, the funds belong to the client, and no "transfer" has occurred.  In

26  Guzzetta v. State Bar (1987) 43 Cal.3d 962, 977, the State Bar Court found

27  that: "2. An attorney owes his client a fiduciary duty in dealing with the client's

28

29

funds deposited in a trust account. 3. Respondent [attorney Guzzetta] was a constructive trustee for Camila Gonzalez with respect to funds in a trust account." A constructive trustee is not the owner of the funds in the trust account. The Supreme Court upheld the foregoing part of the finding, stating, at p. 978: "There is no suggestion that, once the funds were deposited, they either were, or petitioner [attorney Guzzetta] believed that they were, his funds rather than trust funds belonging to his client and/or Camila." Thus, if the funds do not yet belong to the attorney, they belong to the client; in this case the Club. Shelton's invoices to the Club (Ex. D61) show that on her July 8, 2011, bill (Bates 332) Shelton characterized a previous $20,000 payment to herself as a retainer, not belonging to her. The FAC does not allege that the $20,000 retainer was a fraudulent transfer. Shelton subtracted her fees from the retainer, and calculated "left on retainer." On her September 13, 2011, bill (Ex. D61, Bates 340) she showed an additional $100,000 retainer (from the Scapa loan), and after deducting her fees she calculated "left on retainer after this bill." On every bill, Shelton separated the funds still belonging to the client from the funds she had earned.

Rule 4-100(B)(4) of the Rules of Professional Conduct states: "A member shall ...(4) Promptly pay or deliver, as requested by the client, any funds, securities, or other properties in the possession of the member which the client is entitled to receive."

A judgment creditor could reach any unearned fees and levy on those fees in the trust account, for Club was entitled to their return on demand. Shelton was a constructive trustee and could not refuse to return the money or turn it over to a judgment creditor upon a sheriff's levy. Further, no transfer was effective between Club and Shelton as to unearned fees because Shelton did not own the money. No "transfer" occurred until, little by little, Shelton worked on Club's

30

1  cases and ran up a bill.  Kurtz seeks damages arising from interest on the Scapa

2  loan from the date it was disbursed from escrow and was put into Shelton's trust

3  account on August 22, 2011.  She asserts no other date of the asserted

4  transfer.  However, on that date, 100% of the money was held in trust, and no

5  transfer had occurred.

6  **Shelton declares that she still has $119,000 in her trust account**

7  **coming from her two retainers (Shelton Dec., Par. 68.) She has not**

8  **withdrawn the $100,000.** Moreover, she spent $8,750 out of her own pocket

9  on litigation expenses plus the $1,200 filing fee in this case for the Club (Id.) The

10  Club filed a bankruptcy in January, 2012, and Shelton did not know whether she

11  should withdraw any money from the trust account. Later, she thought that the

12  Club might need the money more than she did, and she hesitated to withdraw it

13  until she saw what was going to happen to It (Shelton Dec., Par. 68.)

14  Kurtz has failed to prove a required element of each of her 4 fraudulent-

15  transfer claims: the transfer itself. She has not met her burden.

16  **2. Kurtz has failed to prove that the Club did not receive**

17  **reasonably equivalent value for Shelton's services or that Shelton**

18  **acted in bad faith.**

19  All 4 claims allege that the Club did not receive reasonably equivalent value for

20  the alleged $100,000 transfer to Shelton.  Kurtz does not even allege that she

21  proved this. Instead, she asserts the improper theory that Club did not receive

22  reasonably equivalent value **"in exchange for incurring the Scapa loan."**

23  Since this is what Kurtz contends she has proved, she concedes that she has not

24  proven her case. It is the lack of reasonably equivalent value of Shelton's

25  services that is at issue; not whether the Club got equivalent value for the entire

26  Scapa loan. Kurtz argues an irrelevant non-issue. Since she does not argue that

27  she proves what she has alleged, she has admitted the loss of all 4 of her

28

31

fraudulent  transfer  claims.

Annod Corp. v. Hamilton & Samuels (2002)  100 Cal.App.4th 1286, 1295 discussed the fraudulent conveyance statutes. It stated: "If the debtor received reasonably equivalent value, the inquiry ends there."  Kurtz offered no expert testimony or any testimony that Club did not get reasonably equivalent value for Shelton's attorney services. This element of the case is totally unproven.

Civil Code 3439.03 states:


"Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied ... "


Each time Shelton deducted her litigation fees on her invoices from the remaining retainer--which retainer did not yet belong to her--there was a partial transfer of the retainer. The transfer was the amount of the bill; nothing more, as shown by Shelton's calculations. The  amount transferred was for an antecedent debt--the services Shelton had provided for that billing period, which services predated the transfer shown on the invoices.  Value was given for the transfer, for Club's contract obligation to Shelton was satisfied. Although Shelton's retainer was at $250 an hour (Ex. D21), Shelton billed the Club only $150 (Invoices, Ex. D61.)

Kurtz presents no evidence or makes any contention that Shelton's litigation services were in any way deficient or too expensive.  That proof would have to be the subject of expert testimony, and Kurtz has offered none. Kurtz did not even attempt to introduce evidence to refute  Shelton's testimony that her work on behalf of the Club far exceeded the $100,000.00 retainer, or that by agreeing to limit her fees to $100,000.00 that cap on litigation costs greatly benefitted the Club.

1   The 17th. Claim alleges that Debtor was either insolvent or was rendered

2   insolvent as a result of the transfer of the Scapa Loan Proceeds to Shelton.

3   11 U.S. Code §101 states:

4   "The term "insolvent" means—

5   (A) with reference to an entity other than a partnership and a

6   municipality, financial condition such that the sum of such entity's debts is

    greater than all of such entity's property, at a fair valuation, exclusive of—

7   (i) property transferred, concealed, or removed with intent to hinder,

    delay, or defraud such entity's creditors ..."

8   Kurtz presented no expert evidence of insolvency under any definition of

9   insolvency. She just presents lawyer's argument in her brief. Par. 27 of the FAC

10  alleges that the property was worth $6 million. There is no evidence that Club had

11  more than $6 million in debts at the time of the transfer.

12
    The 16th. Claim alleges: "217. Debtor was engaged in or about to engage in a
13
    transaction for which the remaining assets of the Debtor were unreasonably
14
    small in relation to the transaction." There was no evidence that the Club was
15
    about to engage in a transaction in which its $6 million property was unreasonably
16
    small in relation to the transaction.
17

18  **V.  KURTZ OFFERED NO EXPERT TESTIMONY TO PROVE MALPRACTICE.**

    **SHE HAS NOT MET HER BURDEN.**
19

20
    The second claim for relief of the FAC is for attorney malpractice.
21
    No incompetent or negligent attorney action by Shelton in regards to the
22
    Scapa loan (the only alleged source of damages) has been proven by Kurtz. The
23
    only negligent acts of Shelton alleged in the FAC in relation to the Scapa loan were
24
    giving bad or no advice. As argued extensively earlier, that allegation has been
25
    abandoned by Kurtz.
26
    Daniels v. DeSimone (1993) 13 Cal.App.4th 600, 607 stated:.
27

28
                                    33

"The elements of a cause of action for attorney malpractice are: (1) the duty to use such skill, prudence, and diligence as other attorneys commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence. [Citation.] ... Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal."

` As to attorney malpractice, the California Supreme Court held in <u>Flatt v. Superior Court</u> (1994) 9 Cal.4th 275, 296:

"In a case of professional malpractice, the standard of care against which the acts of the professional are to be measured generally requires expert  testimony."

<u>Lipscomb v. Krause</u> (1978) 87 Cal.App.3d 970, 975-76 stated:

"Plaintiffs' proof relative to these issues generally requires the testimony of experts as to the standards of care and consequences of breach. "(E)xpert evidence in a malpractice suit is conclusive as to the proof of the prevailing standard of skill and learning in the locality and of the propriety of particular conduct by the practitioner in particular instances because such standard and skill is not a matter of general knowledge and can only be supplied by expert testimony. (Citations.) . . ."

Kurtz offered no expert attorney testimony opining that Shelton did not use the skill, prudence. or diligence that other attorneys commonly possess and exercise. That lack of skill must relate to the Scapa loan, for that is the only source of damages relied on by Kurtz. The required proof of malpractice has not been made.

Par. 101 of the FAC alleges that Shelton caused or counseled the Club to obtain the Scapa loan.  Trustee had hoped to prove malpractice by proving that Shelton gave bad advice to the Board in connection with the Scapa loan.  However,

34

1   Kurtz had no testimony from any director that Shelton advised him or her to vote

2   for the loan and no evidence that the loan was irrational or unsound, so that

3   theory is not supportable. Indeed, Herring and Duncan are trying to avoid liability

4   by asserting that they were always absent from Board meetings, even though

5   they did not resign until 2012.

6       Shelton's retainer (EX D21)--her contract with the Club--only obligated Shelton

7   to perform litigation duties. Shelton did not agree to be an advice-giver to Board

8   members, and none of her bills show that she researched the feasibility of or

9   charged the Club for advising anyone on the loan. Shelton's September, 2011, bill

10  (Ex. D61, Bates 340-346) shows her work done in August, 2011, when the Scapa

11  loan was obtained.  The bill shows nothing but litigation work; nothing related to

12  researching or giving advice to the Board on the loan. Kurtz cannot foist on

13  Shelton professional duties that she never agreed to do and that she never

14  performed.  There is no evidence at all that Shelton acted as an attorney in

15  anything relating to the Scapa loan, and her bills refute the unsupported

16  contention that she did.

17      Kurtz contends that it was a conflict of interest for Shelton to represent the

18  Club, Morgan, and Van Tassell in the Alan Harris Superior Court action because

19  they were "potentially adverse parties." (Brief, p;. 46.) However, no expert

20  testified that Club's interests were adverse to Morgan and Van Tassell, and this

21  allegation is unproven.

22      Further, no damages are proven to flow from this alleged conflict. Kurtz has

23  not proven by expert testimony that Shelton did not vigorously defend the Club.

24  Her invoices show otherwise. Kurtz cites a case on p. 18 of her brief that in

25  order to recover damages for malpractice, plaintiff must prove that it would

26  have obtained a better result if the attorney had acted carefully. However, she

27  fails to bring herself within that case.  She produced no expert testimony that

28

35

1  Club would have obtained a better result in the Alan Harris and Barbara Testa

2  cases if Shelton had acted differently. Further, neither case went to trial.

3      A necessary element of malpractice is actual loss or damage resulting from the

4  attorney's negligence. "If the allegedly negligent conduct does not cause damage,

5  it generates no cause of action in tort. The mere breach of a professional duty,

6  causing only nominal damages, speculative harm, or the threat of future

7  harm—not yet realized—does not suffice to create a cause of action for

8  negligence." Budd v. Nixen (1971) 6 Cal.3d 195, 200. Kurtz's allegation that

9  Shelton did not get a waiver of a conflict of interest from Club in defending the

10 Alan Harris action does not prove malpractice.   No expert testified that Shelton's

11 litigation efforts caused any damage.

12     In fact, not one person testified as to any damages caused by Shelton's

13 conduct.   No defendant, no Board member, and no member of the Club--in fact, no

14 one at all--testified complaining about Shelton's representation of the Club.

15 Notably Kurtz did not even testify having any complaints or any issues with the

16 work,

17     Kurtz alleges that Shelton "participated in Club's granting Morgan a $100,000

18 note and deed of trust and use of the Scapa loan proceeds to pay that note."

19 (Brief, p. 46.) First, this is not even conduct by an attorney; it is alleged conduct

20 by a director. Second, no damages were testified to regarding this

21 "participation," and thus no proof of malpractice has been presented. Third,

22 Kurtz misstates the evidence. Shelton, as Board secretary, went back and forth

23 between the Board and Morgan in the hallway presenting each side's offer and

24 counter offer (Par. 48, Shelton dec.) Shelton neither voted for Morgan's TD nor

25 for the Scapa loan because Sherita Herring would not let her vote. Kurtz admits

26 Shelton's nonvoting in her Addendum A.

27     Kurtz goes on at length quoting vitriolic emails between Morgan and Shelton in

28

36

1  November, 2011, when Shelton asked the Board to put Morgan on half time due to
2  loss of $4,300 a month in income caused by David Garrett's sabotage.   None of
3  the insults in the nasty emails were ever proven or acted on by anyone. Kurtz
4  proved no damages arising from these nasty diatribes or anything else. They are
5  irrelevant.

6

7  **VI.   THE 1-YEAR STATUTE OF LIMITATIONS RAN ON ATTORNEY**
8  **MALPRACTICE BEFORE THIS CHAPTER 11 WAS FILED.**

9

10  The Chapter 11 petition was filed on December 13, 2012. The Scapa loan
11  closed on August 22, 2011, almost one year and 4 months earlier. 11 USC 108
12  allows a debtor to file a suit 2 years after the statute of limitations has expired,
13  but only if the statute has not expired before the petition was filed. 11 USC 108
14  states:

15  "(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy
16  proceeding, or an agreement fixes a period within which the debtor may
    commence an action, and such period has not expired before the date of the
17  filing of the petition, the trustee may commence such action only before the
18  later  of—

19   (1) the end of such period, including any suspension of such period
    occurring on or after the commencement of the case; or
20    (2)  two years after the order for relief."

21  Applicable nonbankruptcy law is C.C.P. 340.6(a) which states that an attorney
22  malpractice action "shall be commenced within one year after the plaintiff
23  discovers, or through the use of reasonable diligence should have discovered, the
24  facts constituting the wrongful act or omission, or four years from the date of
25  the wrongful act or omission, whichever occurs first." The California Supreme
26  Court held in Adams v. Paul (1995) 11 Cal.4th 583, 589, fn. 2 that:  "[U]nder the
27  provisions of section 340.6, discovery of the negligent act or omission initiates

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

the [one-year] statutory period ...." Regarding C.C.P. 340.6(a), the California

Supreme Court stated in <u>Lee v. Hanley</u> (2105) 61 Cal.4th 1225, 1236-37:

> "... we conclude that section 340.6(a)'s timebar applies to claims whose merits necessarily depend on proof that an attorney violated a professional obligation in the course of providing professional services. In this context, a "professional obligation" is an obligation that an attorney has by virtue of being an attorney, such as fiduciary obligations, the obligation to perform competently, the obligation to perform the services contemplated in a legal services contract into which an attorney has entered, and the obligations embodied in the State Bar Rules of Pr
> Professional Conduct.""

First, no incompetent or negligent attorney action  by Shelton in regards to the Scapa loan (the only alleged source of damages) have been proven by Kurtz. The only negligent acts of Shelton alleged in the FAC in relation to the Scapa loan were giving bad or no advice. As argued extensively earlier, that allegation has been abandoned by Kurtz.

Second, It is Kurtz's position that the badness of the Scapa loan was known from the outset. Kurtz's brief even calculates interest damages as accruing from the date of loan disbursement to the present (brief, p. 36.) The alleged damages began as soon as the loan closed, and the 12% interest began to run. Alleged damages began upon the loan's closing and knowledge of the loan was immediate.  The statute of limitations has run on the nonexistent acts of Shelton as an attorney in regards to the loan.

## VII. IAN DUNCAN LIED IN HIS DECLARATION STATING THAT HE ATTENDED NO BOARD MEETINGS AFTER MAY 28, 2011.

Ian Duncan was sued as a director in the FAC. Although he was in default, he

38

1    was dismissed because he gave a declaration stating that he did not vote for the

2    Scapa loan or the $100,000 Von Randalhoff loan.  Duncan's trial declaration

3    states:

4        "21. I deny that I participated in any Board meetings after January, 2011,

5    except perhaps May 28, 2011. ...

6        22. I do not remember participating in any Board meetings after May 28,

7    2011."

8        "3 ... I did not formally resign until November, 2012."

9      His declaration is contradicted by his own November 7, 2012, email to

10   Jennifer Morgan that he attaches as Exhibit 67 to his declaration stating:

11   "Firstly, I simply feel that I have no time to help the club, have not been at any

12   board meetings for the better part of a year ..."

13

14     The "better part of a year" is not a full year. It is at most 7-11 months.

15   Duncan wrote this email on November 7, 2012. Thus, Duncan must have attended

16   meetings after May 28, 2011, for he probably did not quit attending meetings any

17   sooner than January, 2012.  His declaration is patently false, an attempt to

18   distance himself from any involvement in the loans in order to get dismissed from

19   this case.

20     Even worse, Kurtz knew that Duncan was lying because the contradiction

21   between his November 7, 2012, email and his declaration stating that he attended

22   no meetings after May 28, 2011, is obvious.

23     Shelton and Morgan both testified that Ian Duncan attended Board meetings

24   through January, 2012. Shelton testified that she had an argument with Duncan

25   and Herring at the November 4, 2011, board meeting that she called. She told the

26   Board  that less money should be spent on renovations and that Morgan should be

27   put on half time due to the loss of a $4,300 a month continuous rental, caused by

28

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

David Garrett's sabotage. Duncan and Herring both voted to eject Shelton from the Board for her proposal. Shelton's testimony showed that Duncan (and Herring) were sitting on the Board, knew about the Scapa loan and renovations, and they knew that Morgan was still working and must have been paid for her claims.

Further, Duncan failed to respond to Edna Jones' email,  Exhibit 131, where Jones asked Duncan: "So you are not one of the Board members who approved the 700K loan and/or the salary of Jennifer Morgan? I need to know." This is an admission by silence.

The Scapa loan closed on August 22, 2011. Shelton declares that she polled the Board members by phone in August, 2011, and that the loan and disbursements were approved. Shelton and Morgan testified that Nina Van Tassell called a Board meeting shortly after the loan closed, and that all 7 Board members attended. Shelton's minutes setting forth the approval at the phone meeting were approved, and no one objected to the loan, including Ian Duncan, Sherita Herring, or Lorraine Genovese.  No one denied voting in favor of the loan or disbursements until after everyone had been sued.  Futher, there was no Club record of Genovese's alleged resignation letter, and Morgan never heard of it.

## VIII.  HEIDE KURTZ PRESENTED NO EVIDENCE OF HER STANDING TO SUE.

The named plaintiff in this suit is Heide Kurtz in her capacity as Chapter 11 trustee. Kurtz did not testify. She offered no evidence to support the threshold allegation of Par. 4 of the FAC: "The Trustee is the duly appointed, qualified and acting chapter 11 trustee for the Debtor's bankruptcy Estate." It is Kurtz's

CLOSING BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

1  burden to prove that allegation, that she presently is the Chapter 11 Trustee.

2  Further, the caption of all of her briefs states that Kurtz is Plan Trustee. That

3  is not the plaintiff in this lawsuit.  Kurtz offered no evidence that she is the Plan

4  Trustee or that the Plan Trustee has any authority to take over the duties of the

5  Chapter 11 Trustee. The Plan Trustee was never substituted into this case for

6  the Chapter 11 Trustee

7

8  ## IX. THERE IS NO EVIDENCE THAT THE BREACH OF FIDUCIARY DUTY

9  ## AND MALPRACTICE CLAIMS ARE CORE PROCEEDINGS.

10

11  Par. 1 of the FAC alleges that the court has jurisdiction over the  breach

12  of fiduciary duty and malpractice claims because they are core proceedings.  No

13  evidence was submitted to prove this allegation, and Kurtz has not  met her

14  burden.

15

16  **CONCLUSION**

17

18  Shelton and Wallace are not liable for any alleged damages.  Judgment should

19  be entered in their favor.

20

21  April 21, 2017          LAW OFFICE OF ALDA SHELTON

22

23  *Alda Shelton*

24  BY: ALDA SHELTON, ATTORNEY FOR MICHAEL WALLACE

25  AND ALDA SHELTON

26

27

28

41

## PROOF OF SERVICE

I am over 18 and not a party to this action.  My business address is 11736 Woodbine Street, Los Angeles CA 90066.

A true and correct copy of the foregoing POST-TRIAL BRIEF OF ALDA SHELTON AND MICHAEL WALLACE will  be served as below:

1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING. Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and Hyperlink to the document.  On April 21, 2017, I checked the CM/ECF docket for the adversary action and  termined that the following persons are on electronic mail notice to receive NEF transmission

**BY NEF:**

lekvall@swelawfirm.com

aspaeth@swelawfirm.com  csheets@swelawfirm.com,  gcruz@swelawfirm.com, hdavis@swelawfirm.com

bgaschen@wgllp.com, kadele@gwllp.com

trustee@hkurtzco.com

klacey@lddlaw.net

davidtilem@tilemlaw.com

ustpregion16.la.ecf@usdoj.gov

aldashelton@yahoo.com

jad@hssalaw.com

42

TRIAL BRIEF OF ALDA SHELTON AND MICHAEL WALLACE

2. The following were served by US mail and email on April 21, 2017:

Jennifer Morgan

2408 Detour Drive

Los Angeles CA 90068 and by email to jennifermorgan013@gmail.com

Carmen Hillebrew

3650 Los Feliz Blvd., Unit 44

Los Angeles 90027 and by email to carmencarmen999@gmail.com

SHERITA HERRING

468 NORTH CAMDEN, SUITE 200

BEVERLY HILLS CA 90210 sherita@sheritaherring.com

and by email to AUTUMN SPAETH AT aspaeth@swelawfirm.com

3.  On April 24, 2017, Judge Barry Russell will be served by personal service as follows:

Judge Barry Russell

US Bankruptcy Court

 255 East Temple Street, Courtroom 1668

Los Angeles CA 90012-3332.

I declare, under penalty of perjury of the laws of the United States, that the foregoing is true.  Executed at Los Angeles CA on April 21, 2017.

43

TRIAL BRIEF OF ALDA SHELTON AND MICHAEL WALLACE